**Mary Ruth (Biliter) ROBINETTE, Appellant,**

v.

**Berlin Carlson ROBINETTE, Appellee.**

**No. 86–CA–1559–MR.**

Court of Appeals of Kentucky.

July 24, 1987.

Discretionary Review Denied by Supreme Court Oct. 7, 1987.

352

Lawrence R. Webster, Pikeville, for appellant.

W. Sidney Trivette, Pikeville, for appellee.

Before HAYES, McDONALD and WEST, JJ.

McDONALD, Judge:

This is a dissolution action. Mary Ruth Robinette (Ruth) appeals from the judgment of the Pike Circuit Court and contests the adequacy of the maintenance and child support awards, the division of marital property, the finding that she dissipated certain marital funds and the court's failure to require the appellee, Berlin Carlson Robinette (Carson) to pay the cost of the only appraiser who testified.

Ruth and Carson were married in 1976. Carson came to the marriage with a tract of land,[1] a house under construction on the lot and a three-year-old daughter from a previous marriage. In 1977 Carson and Ruth became the legal guardians of Carson's deceased brother's two children, a boy, Julius, then six years of age, and Alice, nine years old. Alice, now emancipated, continues to reside with Ruth. In

---

1. Although the trial court awarded Carson the value of the lot as his nonmarital property, the record indicates that Carson continued to pay his first wife for her interest in the realty during his marriage to Ruth. Ruth does not, however, fault the trial court in its characterization of the lot as nonmarital.

1983 Carson and Mary adopted a two-year-old child, Matthew, custody of whom the court awarded to Ruth.

The Robinettes enjoyed a comfortable standard of living during their nine-year marriage. Carson operated a trucking business. In addition to a $60,000 home with a swimming pool, the Robinettes had a 25-foot, Winnebago-type motor home, a speed boat, a four-wheel drive, off-the-road recreational vehicle, a Chevrolet Camaro used by Carson for racing, and several other vehicles, including 1977 and 1984 model pickup trucks, a 1982 Chevrolet Chevette used exclusively by Alice, a 1980 Monza and a 1983 Cadillac used by Ruth. A few years ago the parties purchased another residence which they improved and used as rental property.

The assets of the trucking company were all acquired during the marriage with marital funds and include a tract of land with a garage, six coal-hauling trucks and at least $16,000 worth of tools.

Ruth and Carson separated in October, 1985. At the time of dissolution they were both 39 years old, or close thereto. Carson was in good health and had earnings in 1985 in excess of $40,000. This was a year he described as a poor one due to the depressed coal market. Ruth described her health as "so-so." She has a ruptured stomach and a steel plate in one hand. She has a tenth grade education and had, prior to the marriage, obtained vocational training and is certified as a licensed practical nurse. She did not pursue this line of work during the marriage but, in addition to raising four children, worked with Carson in the trucking business by paying the bills, running errands and assisting in making repairs to the trucks.

The Robinettes began experiencing money problems. Either shortly before or after the separation, the rental property, the 1983 Cadillac and the boat were either foreclosed on or repossessed.[2] Carson testified that Ruth took money from the business for her own personal use. A bookkeeper testified that over $14,000 worth of checks were mis-stubbed, that is, written for one thing but recorded as paying something else. The trial court found that Ruth had dissipated the marital estate for her own end and charged her share of the estate with half the alleged amount of dissipation.

In the end Ruth received the sum of $6,330 as her share of the marital estate. That was derived by dividing in half the equity in the marital property after the court deducted $7,000, half the sum allegedly dissipated by Ruth. In addition she was awarded the wrecked 1980 Monza, maintenance of $200 a month for one year and child support of $300 per month. Carson received the house, almost all the furnishings and appliances,[3] the business and all its assets, the 1984 pickup truck, the race car, the motor home and other vehicles, and the debt on all these items. Ruth, unhappy being on the street with very little property and income of only $500 per month (which will be reduced to $300 a month after a year) and owing $1,000 to the only appraiser who testified, has understandably taken an appeal to this Court.

The appellant first complains of the court's division of the marital estate which reflected the court's finding that she had dissipated certain marital funds.[4] Her argument in this regard is twofold: (1) She asserts that dissipation of marital funds may not, as a matter of law, be considered as a factor in determining the proper disposition of marital funds; and (2) she argues there is no evidence of record to support

2. Ruth complains bitterly that Carson allowed those items it appeared she might be awarded in the divorce to go by default. Although such could easily be inferred from the record, the trial court made no finding in this regard. On remand the trial court should determine whether Carson dissipated the marital estate.

3. Ruth received a bedroom suite and living-room suite.

4. The court made the following finding: "Prior to August of 1985, the Petitioner was keeping the books for the Respondent's trucking business and during that time, the Petitioner, by her own admission, misused funds of the trucking company by giving gifts to her family and dissipated funds of the company for her own personal use."

the court's finding that such dissipation occurred.

KRS 403.190(1) provides that "[The court] also shall divide the marital property *without regard to marital misconduct* in just proportions considering all relevant factors...."[5] (Emphasis our own.) Nevertheless, there is authority in this jurisdiction to require one to account for marital property improvidently spent. *Barriger v. Barriger*, Ky., 514 S.W.2d 114 (1974). We believe the concept of dissipation, that is, spending funds for a nonmarital purpose, is an appropriate one for the court to consider when the property is expended (1) during a period when there is a separation or dissolution impending, and (2) where there is a clear showing of intent to deprive one's spouse of his or her proportionate share of the marital property. *Id.*, p. 115; *see also Culver v. Culver*, Ky.App., 572 S.W.2d 617 (1978).

Applying these principles to the instant case, it is clear that the evidence fails to support the determination that Ruth dissipated marital funds. While there was a showing that over a period of several months Ruth used money from the business for nonbusiness-related reasons, there was no showing of what the money was used for. Carson did not introduce the canceled checks to show to whom the checks were made payable, nor did he ask the bookkeeper for this information.[6] There is no evidence of when the marital breakdown occurred or whether the money was spent at a time when dissolution was being contemplated. More importantly, there was no testimony from which the court could infer that Ruth used the money for a personal, as opposed to marital reason, and certainly no evidence that it was spent with the intent of depriving Carson of his share of the estate.

The court found that Ruth "admitted" misusing the funds. However, the record contains no such admission from Ruth and in this regard the finding is clearly erroneous. She did testify that she occasionally gave her sister as much as $100 to buy groceries, but denied taking any money from the business for her own benefit. As in the *Culver* case, there was no testimony that these gifts were used to dissipate the marital estate. While giving gifts to family members could constitute dissipation, the evidence relevant to this use in the instant case indicates that such charity was a marital enterprise.[7] Thus, the court erred in characterizing Ruth's gift of funds as dissipation and thereby decreasing her share of the marital estate.

Ruth next contends that the trial court erred in its awarding a sum of maintenance inadequate in amount and duration. We agree. Even after the trial court amends its award of marital property on remand to conform to our holding herein, the disparity between the economic positions of the parties is staggering.

Carson was awarded possession of the marital residence and the business. While the business equipment is heavily indebted, it provides Carson with an income in excess of $40,000 yearly. Carson, who did not testify to any health problems, comes out of the dissolution with very little change in his standard of living. Ruth, on the other hand, faces a drastic reduction in her standard of living. She has almost no property and must find new living accommodations. She has health problems, a small child to care for, and a tenuous capacity for employment. Although a licensed practical nurse, she has not been so employed for more than ten years. Factually, this case is strikingly similar to *Carter v. Carter*, Ky.App., 656 S.W.2d 257 (1983). As in the

---

**5.** The statute goes on to list "relevant factors" but does not include failure to preserve marital funds.

**6.** The current bookkeeper testified that sums were spent on nonbusiness debts, but she had no knowledge of what the funds were used for. She knew, but was not asked to testify to whom the checks were written.

**7.** As stated previously, the parties were raising two of Carson's brother's children in their home. There was other testimony of financial assistance to family members not residing with the parties.

*Carter* case, the trial court regrettably made no specific findings in reference to the factors delineated in KRS 403.200(2)(a)–(f), those elements it must consider in setting the amount and duration of maintenance. However, it is clear from the record that Ruth and the parties' child cannot maintain anything close to the lifestyle to which they were accustomed during the marriage, not to mention any semblance of economic stability with the meager maintenance and child support awarded. The maintenance award represents a flagrant abuse of discretion and the trial court must, on remand, make an appropriate award considering all the statutorily proscribed factors. *Carter v. Carter, supra; Combs v. Combs,* Ky.App., 622 S.W.2d 679 (1981); *Frost v. Frost,* Ky.App., 581 S.W.2d 582 (1979); and *Atwood v. Atwood,* Ky. App., 643 S.W.2d 263 (1982).

■ Likewise, the court's amount of child support constitutes an abuse of discretion. KRS 403.210 sets out five factors the trial court must consider in setting the amount of support. There are simply no findings relative to these factors in the decree and no factual basis in the record to support the court's award of only $300 per month.[8] *See Moss v. Moss,* Ky.App., 639 S.W.2d 370 (1982). Upon remand, the court is directed to establish a more equitable amount of support consistent with the considerations articulated by our legislature.

Finally, considering the financial positions of the parties, the court erred in requiring Ruth to be totally responsible for the appraiser's fee. KRS 403.220.

The judgment of the Pike Circuit Court is reversed and this case is remanded for further proceedings consistent with this opinion.

All Concur.

---

8. The inequity of the court's resolution of these financial issues is particularly underscored by the fact that Carson pays more per month for the debt on the motor home, which he described as a "piece of junk," than the court requires that he pay to Ruth for maintenance and child support.