1464

John W. PANHORST, Jr., Respondent v. Barbara P. PANHORST, Appellant.

(390 S. E. (2d) 376)

Court of Appeals

*Vance B. Drawdy, Horton, Drawdy, Ward & Johnson,* and *Sally G. Young,* Greenville, *for appellant.*

*Kenneth C. Porter,* of *Porter & Rosenfeld,* Greenville, *for respondent.*

Heard Nov. 13, 1989.

Decided Feb. 20, 1990.

BELL, Judge:

John W. Panhorst petitioned the family court for a divorce from his wife, Barbara P. Panhorst, on the ground of adultery. He also sought equitable division of the marital estate, custody of the younger of the two children of the marriage, child support, possession of the marital residence, and attorney's fees. Barbara denied the adultery and counterclaimed for separate maintenance and support, equitable division of marital property, temporary possession of the marital residence, and attorney's fees. The family court granted John's petition for divorce, gave him custody of the

child, denied alimony and child support to each party, awarded the marital residence to John, and divided the rest of the marital estate on a ratio of 55% to John and 45% to Barbara. Each party was required to pay his or her own attorney's fees. Barbara appeals. We affirm.

## I.

Barbara challenges the court's finding that she committed adultery. She asserts the court erred in refusing to let her testify that her alleged paramour, Lasater, is impotent and thus incapable of having normal sexual intercourse with her. The judge excluded the testimony on the ground that impotency must be established by expert medical testimony.

There was undisputed evidence that Barbara committed adultery with Seymour Wolfe in 1977. She admitted that Lasater accompanied her on most of the twenty-one nights she spent away from home on business during the year prior to the divorce action. She admitted they stayed at the same motels by prearrangement and spent much time together in their rooms. She also admitted she went with Lasater on a pleasure trip to Cancun, Mexico, where they stayed together in the same hotel room. Finally, she admitted she slept all night with Lasater in the same bed in a motel room in Rock Hill, South Carolina. A private investigator saw her leaving that room at 6:30 a.m. in a short, sheer, pink nightgown.

This evidence showed both an inclination and the opportunity to commit adultery. Proof of inclination and opportunity is sufficient to establish a prima facie case. *See Hartley v. Hartley*, 292 S. C. 245, 355 S. E. (2d) 869 (Ct. App. 1987) (adultery may be proven by circumstantial evidence showing inclination and opportunity to commit adultery). Barbara responds, however, that she was in a position to rebut the inference of adultery by testifying that Lasater is impotent. She was prevented from doing so, she argues, when the judge ruled she must establish impotence through a medical expert. Barbara contends her lay testimony on the issue was admissible because she "had special knowledge and first hand experience, which made her com-

---

[1] We leave it to the reader to consider how she acquired her "special knowledge and first hand experience" of Lasater's lack of sexual prowess.

petent to give her nonexpert opinion."[1]

We need not decide whether expert testimony was required to prove Lasater's impotence. For purposes of this appeal, we assume sexual impotence can be established by a lay witness testifying from personal experience. We nevertheless hold that the exclusion of Barbara's testimony was harmless error.

This Court noted in *Doe v. Doe*, 286 S. C. 507, 334 S. E. (2d) 829 (Ct. App. 1985), that the statute making adultery a ground for divorce[2] does not define the term "adultery." At common law, adultery is the illicit intercourse of two persons, one of whom, at least, is married. *Hull v. Hull*, 21 S. C. Eq. (Strob.) 174 (1848). Since there is nothing to show the Legislature intended a different meaning, we must understand the word to have been employed in this sense by the statute. *Id.*[3]

At common law, marriage is both a contract and a status. *Fennell v. Littlejohn*, 240 S. C. 189, 125 S. E. (2d) 408 (1962); *Garlock v. Garlock*, 279 N. Y. 337, 18 N. E. (2d) 521 (1939). As a status, it gives rise to rights and duties imposed by law on the marriage partners. *Id.* Among these are material support and consortium, i.e., the conjugal society, comfort, companionship, and affection of each other. *Id.; Bennett v. Bennett*, 116 N. Y. 584, 23 N. E. 17 (1889). Sexual fidelity is a fundamental duty of the marital relationship.[4] As far as the law is concerned, the contract of marriage is, in its essence, a consent on the part of a man and a woman to cohabit with

---

[2] Section 20-3-10, Code of Laws of South Carolina, 1976, as amended.

[3] Civil adultery is more extensive than its criminal counterpart. Consequently, definitions of adultery in criminal statutes are not applicable to matrimonial causes. *See* T. Reeve, *The Law of Baron and Femme* (1816), at 207; *see also Orford v. Orford*, 49 Ont. L. R. 15, 58 D. L. R. 251 (1921), distinguishing *State v. Frazier*, 54 Kan. 719, 39 P. 819 (1895), and similar authorities.

[4] An early reason for the rule was to prevent the wife from conferring a spurious heir on the husband. J. Bishop, *Commentaries on the Law of Marriage and Divorce*, 4th ed., Sec. 704 (1864). Following this rationale, one common law court has held that artificial insemination of the wife with the sperm of a third party without the husband's consent constitutes adultery, although no act of sexual intercourse occurs. *See Orford v. Orford*, 49 Ont. L. R. 15, 58 D. L. R. 251 (1921) (essence of adultery consists, not in moral turpitude of the act of sexual intercourse, but in voluntary surrender of reproductive powers to the service or enjoyment of any person other than the husband or wife).

each other and with each other only.[5] This means a husband and wife must confine their sexual activity exclusively to one another. Sexual relations with a person other than the marriage partner are illicit because they violate this marital duty of exclusiveness.

Barbara's position rests on the unstated assumption that illicit sexual intercourse consists solely of the normal act of consummation between a man and a woman. We need not decide exactly what sex acts do and do not constitute adultery. Suffice it to say that where, as here, a married woman, with a history of having committed adultery, spends the night, undressed, in the same bed with a man, with whom it appears she is romantically involved and to whom she is not married, her actions warrant the finding that she has committed adultery.

Far from rebutting the prima facie case against her, her assertion that she has first knowledge and experience of Lasater's sexual abilities, if the family court had considered it, would have supported the court's finding of adultery. For this reason, she suffered no harm from the exclusion of her testimony.

## II.

Barbara also challenges the equitable distribution. During the marriage, John gave his mother gifts of money totalling between $25,000 and $30,000. The gifts were made over the course of twenty years and were typically $1,000 to $2,000 a year. Apparently, Barbara knew nothing about them and did not consent to them. She claims the family court should have treated them as part of the marital estate eubject to equitable division. Her argument presents a question of first impression in South Carolina.

Marital property is that real and personal property acquired by the spouses during the marriage which is owned by them at the date of filing of marital litigation. Section 20-7-473, Code of Laws of South Carolina, 1976, as amended. The money in dispute here was not marital property because, at the time the action was filed, it no longer belonged

---

[5] *Harrod v. Harrod* (1854) 1 K. & J. 4, 69 Eng. Rep. 344.

to either of the Panhorsts as the statute requires. Thus, it was not subject to equitable distribution.

The statute embodies the Legislature's decision that the marital estate must be identified as of a fixed date. Given the vicissitudes of life, the parties' fortunes will change over the years of a marriage. Often the marital estate may have enjoyed a greater value in the past than it does at the dissolution of the marriage. It may be affected by changes in the incomes and earning capacities of the spouses, their spending habits, their savings and investments, and a host of other factors. By requiring the estate to be identified as of the date marital litigation is filed, the Legislature has elected to foreclose the spouses from litigating every expenditure or transfer of property during the marriage. One spouse or the other may have spent marital funds foolishly or selfishly or may have invested them unprofitably. The statute wisely prevents the other spouse from resurrecting these transactions at the end of the marriage to gain an advantage in the equitable distribution. Were it to do otherwise, human greed and vindictiveness would transform the courts into "auditing agencies for every marriage that falters." *In re Marriage of Getautas*, 189 Ill. App. (3d) 148, 151, 136 Ill. Dec. 509, 513, 544 N. E. (2d) 1284, 1288 (1989).

Barbara cites a number of cases she claims support treating the money given to John's mother as part of the marital estate.[6] Without exception, these cases involve fraudulent transfers or dissipation of marital assets in contemplation of the breakdown of the marriage. This alone makes them distinguishable. In this case, there is no evidence that John gave his mother money in contemplation

---

[6] *Zohlman v. Zohlman*, 235 So. (2d) 532 (Fla. App. 1970), *cert. denied*, 238 So. (2d) 430 (Fla. 1970); *Parsons v. Parsons*, 68 Wis. (2d) 744, 229 N. W. (2d) 629 (1975), *overruled on other grounds, Bloomer v. Bloomer*, 84 Wis. (2d) 124, 267 N. W. (2d) 235 (1978); *Ahlo v. Ahlo*, 1 Haw. App. 324, 619 P. (2d) 112 (1980); *Karr v. Karr*, 628 P. (2d) 267 (Mont. 1981); *In re Marriage of Smith*, 114 Ill. App. (3d) 47, 69 Ill. Dec. 827, 448 N. E. (2d) 545 (1983), *criticized, In re Marriage of O'Neill*, 185 Ill. App. (3d) 566, 133 Ill. Dec. 617, 541 N. E. (2d) 828 (1989), *followed, In re Marriage of Getautas*, 189 Ill. App. (3d) 148, 136 Ill. Dec. 509, 544 N. E. (2d) 1284 (1989), *overruling, In re Marriage of O'Neill, supra; In re Marriage of Paulsen*, 677 P. (2d) 1389 (Colo. App. 1984); *Kuehn v. Kuehn*, 594 S. W. (2d) 158 (Tex. Civ. App. 1980); *Roach v. Roach*, 72 Wash. (2d) 144, 432 P. (2d) 579 (1967).

of divorce or with intent to deprive Barbara of her right to equitable distribution. Barbara's argument that the mother did not need the money is irrelevant. In the absence of fraudulent intent, it is not unlawful for spouses to make outright gifts to others during the marriage. Barbara's authorities are simply not in point.[7]

## III.

Finally, Barbara maintains the court erred in ordering her to vacate the marital residence by January 4, 1988, after expressly finding that ninety days was a reasonable time for her to find other accommodations. Ninety days from the date of the order was February 20, 1988.

Barbara makes no showing that she could not find other accommodations by January 4, 1988. As we understand the record, she actually obtained another place to live on or before that day. Thus, we fail to see how she was prejudiced by the judge's order. She was not entitled to remain in the marital residence any particular length of time. As long as she received a reasonable time, in fact, to leave the marital residence, her interest was fully protected.

For the reasons stated, we affirm the judgment.

Affirmed.

SHAW and CURETON, JJ., concur.

---

[7] More in point are the cases of *In re Marriage of Aud,* 142 Ill. App. (3d) 320, 96 Ill. Dec. 615, 491 N. E. (2d) 894 (1986), and *Robinette v. Robinette,* 736 S. W. (2d) 351 (Ky. App. 1987), authorities not cited by either party.

*Aud* involved a husband's expenditure of $70,000 in marital funds to support his widowed mother. The court held the expenditure did not constitute dissipation of marital assets in contemplation of divorce and should not be considered in making the equitable distribution.

In *Robinette,* the court held that cash gifts of the wife to her sister were not dissipation of the marital estate, although they were made without the husband's knowledge. The court found the gifts were not made in contemplation of dissolution of the marriage or with intent to deprive the husband of his proportionate share of the marital property.